**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Rita R. Brogan, | : | Case No. 3:14CV714 |
| Plaintiff, | : | |
| | : | |
| | : | Judge James G. Carr |
| v. | : | |
| | : | |
| Commissioner of Social Security, | : | **REPORT AND** |
| Defendant. | : | **RECOMMENDATION** |
| | : | |
| | : | |

## I.  INTRODUCTION

This case was referred to the undersigned Magistrate Judge for Report and Recommendation pursuant to Local Rule 72.2(b)(2).  Plaintiff Rita R. Brogan ("Plaintiff") seeks judicial review pursuant to 42 U.S.C. § 405(g) of Defendant Commissioner's ("Defendant") final determination denying her claim for Social Security Income ("SSI") under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381, *et. seq.*  Pending are briefs on the merits filed by both parties (Docket Nos. 14 & 17), and Plaintiff's Reply (Docket No. 18).  For the reasons set forth below, the Magistrate recommends that this Court reverse the Commissioner's decision.

## II. PROCEDURAL HISTORY

On May 24, 2011, Plaintiff filed her application for SSI, alleging disability beginning November 2, 2006 (Docket No. 12, pp. 164-169 of 337).  Plaintiff's claim for SSI was denied initially on August 4, 2011, and upon reconsideration on November 30, 2011 (Docket No. 12, pp. 131-133; 137-139 of 337).  Plaintiff filed a written request for a hearing on January 16, 2012 (Docket No. 12, pp. 140-142 of 337).  On February 27, 2013,

Administrative Law Judge (ALJ) Melissa Warner presided over a hearing in Toledo, Ohio, at which Plaintiff, represented by counsel Mary Meadows, and Vocational Expert (VE) Charles H. McBee appeared and testified (Docket No. 12, pp. 23; 42 of 337).  The ALJ issued an unfavorable decision on March 26, 2013 (Docket No. 12, pp. 23-35 of 337).  The Appeals Council denied review of the ALJ's decision on January 31, 2014, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 12, p. 5 of 337).

### III.  FACTUAL BACKGROUND

**A.    ADMINISTRATIVE HEARING**

**1.    PLAINTIFF'S TESTIMONY**

Plaintiff testified that she was 44 years old, single, weighs approximately 232 pounds, and lives with her aunt  (Docket No. 12, pp. 46-47 of 337).  Plaintiff is the mother of four children, all of whom live with other family members (Docket No. 12, p. 56, 268-281 of 337).  Plaintiff is a high school graduate and can read, write and perform basic math (Docket No. 12, pp. 47-48 of 337).  Plaintiff testified that she last worked in 2010, has no current source of income or medical insurance, relies on her aunt to pay bills, and receives food stamps (Docket No. 12, p. 48 of 337).  Plaintiff detailed her past employment history including work in the food service industry, for a plastics company removing items from an assembly line and packaging them and in a factory soldering small parts (Docket No. 12, pp. 49-52 of 337).

Since she stopped working, Plaintiff noted that she has not been as stressed, experienced decreased pain, nervousness, and anxiousness (Docket No. 12, p. 53 of 337).  Plaintiff opined that she could walk between five and ten minutes before experiencing pain in her knees, back and feet (Docket No. 12, p. 53 of 337).  Plaintiff testified about her history of physical issues, indicating that her knee pain began five years ago, that she has suffered from back problems since 2004, and issues with her feet for four or five years, although she conceded that no doctor had diagnosed the nature of her foot problems (Docket No. 12, p. 53 of 337).  Plaintiff reported

2

that she is unable to stand or walk more than 15 to 30 minutes and cannot sit longer than an hour due to her pain (Docket No. 12, p. 54 of 37).  Plaintiff also explained that she is unable to carry a gallon of milk in either of her hands due to issues she has gripping and sharp pains in her wrists, which cause her to drop things (Docket No. 12, p. 54 of 337).  Plaintiff noted that the problems with her hands had existed for years and are the result of carpel tunnel syndrome (Docket No. 12, p. 55 of 337).

Plaintiff described a typical day, explaining that she wakes up between six or eight with back pain, gets dressed, eats breakfast, cleans up, relaxes her back, watches television, prepares her remaining meals and does appropriate clean up(Docket No. 12, p. 56 of 337).  Plaintiff listed her medications as Depakote, Wellbutrin, Seroquel, Risperdal, Ibuprofin, Tylenol, and Mobic (Docket No. 12, p. 56 of 337).  Plaintiff added that her medications make her drowsy and give her "the shakes" (Docket No. 12, pp. 56-57 of 337).  Plaintiff testified that taking Tylenol or Ibuprofin, lying down, elevating her legs and stretching all help, but do not eliminate her pain  (Docket No. 12, p. 57 of 337).  Plaintiff estimated that she lies down two to three times a day for approximately 30 minutes to one-hour because her back hurts or because of problems with her knees (Docket No. 12, pp. 57-58 of 337).  When describing her pain, Plaintiff explained that sometimes it prevents her from sleeping and that she usually sleeps about six hours a night (Docket No. 12, p. 58 of 337).  In her free time, Plaintiff indicated that she prefers to watch television over reading, noting that she watches game shows, soap operas, the news, and occasionally a movie. She noted that she gets distracted watching movies and finds herself unable to follow the story (Docket No. 12, p. 58-59 of 337).  Plaintiff is able to shower, dress, and feed herself (Docket No. 12, p. 59 of 337).  She also smokes a half pack of cigarettes a day (Docket No. 12, p. 59 of 337).

During direct examination by her attorney, Plaintiff indicated that her knee and back pain and mental health have been about the same since September, 2010 (Docket No. 12, pp. 59-60 of 337).  Plaintiff described

3

having problems remembering what to do, keeping up with the pace and having urinary frequency during a vocational program that she participated in (Docket No. 12, pp. 60-61 of 337).  Plaintiff testified that her pain causes her difficulty  getting out of bed and moving around.   She is easily distracted  and does not go to the grocery store alone because she unable to lift items from the shelves or to monitor her spending (Docket No. 12, pp. 62-63 of 337).  Despite being on a good medication regime, Plaintiff still reported  feeling nervous, anxious, and depressed about not being able to see her youngest son (Docket No. 12, p. 63 of 337).  According to Plaintiff, her depression is sometimes so severe that she does not get out of bed, which she estimated occurs two or three times per month (Docket No. 12, p. 64 of 337).  Plaintiff opined that her stress affects her mental health and makes her symptoms worse, explaining that she gets aggravated and irritated more easily (Docket No. 12, p. 64 of 337).  Plaintiff also explained that she gets overwhelmed and cannot do things she would ordinarily be able to do (Docket No. 12, p. 65 of 337).

2.    **VE Testimony**

The VE described Plaintiff's past relevant work as  solder assembly work, DOT[1] 813.684-022, with a specific vocational preparation (SVP)[2] of 2, listed at the light exertion level, but performed by Plaintiff at a sedentary exertion level,  inspector and hand packager, DOT 559.687-074, with an SVP of 2, listed and performed by Plaintiff at a light exertion level; and assembly line work, DOT 706.684-018, with an SVP of 3, listed and performed at a medium exertion level (Docket No. 12, p. 70 of 337).  The ALJ then posed the first of two hypothetical questions:

---

[1]  Dictionary of Occupational Titles ("DOT")

[2]  SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

> Let's assume we have a hypothetical individual who can perform all the functions of light work except occasional climbing of ladders and the like, occasional kneeling, frequent crouching, no crawling.  Work with an SVP of 1 to 2 where the pace of productivity is not dictated by an external source over which the individual has no control such as an assembly line or conveyor belt. Occasional contact with the general public, occasional contact with supervisory authority.  Would such a person be able to perform the claimant's past relevant work?

(Docket No. 12, pp. 70-71 of 337).  After considering the hypothetical question the VE testified that all but Plaintiff's past work as hand packager would be eliminated (Docket No. 12, p. 72 of 337).  The ALJ then asked whether there would be any other work that such an individual could perform (Docket No. 12, p. 72 of 337). The VE answered affirmatively, providing the occupations of folder of laundry products, DOT 369.687-018, with an SVP of 2, listed at a light exertion level, having at least 75,000 jobs in the national economy and 2,000 in the State of Ohio; machine operator DOT 207.685-014, with an SVP of 2, listed at light exertion, having at least 135,000 jobs in the national economy and 2,000 in Ohio; and palletizer, DOT 929.687-054, with an SVP of 2, listed at a light exertion level, having at least 90,000 jobs in the national economy and 1,500 in Ohio (Docket No. 12, pp. 72-73 of 337).

> The ALJ then posed her second hypothetical question, asking the VE:

> Let's assume that we added the work needed to be . . . done in a seated or standing position.  How would that change your answer first as to the past relevant work and second to the other work you've identified?

(Docket No. 12, p. 73 of 337).  The VE indicated that both Plaintiff's past work and the other jobs could be performed sitting or standing with the exception of the palletizer job, which the VE replaced with the position of hand trimmer, DOT 781.687-070, with an SVP of 2, listed at a light exertion level, having at least 60,000 jobs in the national economy and 1,000 in Ohio (Docket No. 12, p. 73 of 337).  The VE did, however, clarify his testimony that the DOT does not account for a sit or stand option and that the his testimony was based upon his experience and education (Docket No. 12, pp. 73-74 of 337).

> The ALJ next inquired as to whether there was any allowance for lying down over the course of a work

5

day (Docket No. 12, p. 74 of 337).  The VE responded to the ALJ's question, noting that there is no such allowance (Docket No. 12, p. 74 of 337).  The ALJ then asked about the tolerance for elevating an individual's legs and the VE testified that elevation is allowed for up to approximately 12 inches (Docket No. 12, p. 74 of 337).  The ALJ also inquired about the requirements for being on task (Docket No. 12, p. 74 of 337).  The VE explained that generally, an individual is required to be on task for at least 80% of the work day (Docket No. 12, p. 74 of 337).  According to the VE, being consistently off task 20% or more would result in disciplinary action and/or dismissal (Docket No. 12, p. 74 of 337).  In response to the ALJ's question as to the ordinary tolerance for absenteeism, the VE answered that consistently missing more than one day per month, on a consistent basis, beyond allocated sick or vacation time, would be met with disciplinary action or dismissal (Docket No. 12, pp. 74-75 of 337).  Moreover, the VE opined that missing up to 10 days over the course of a year or missing even one day within a 90-day probationary period, would also result in termination (Docket No. 12, p. 75 of 337).  Finally, the ALJ inquired about ordinary breaks during the course of a workday, and the VE explained that ordinary breaks include a 15-minute break in the morning and afternoon and generally a 30-minute lunch break (Docket No. 12, p. 75 of 337).

On cross examination, Plaintiff's counsel inquired whether the hand packager job listed in the VE's earlier testimony would be eliminated if the pace of production were set by a machine (Docket No. 12, pp. 75-76 of 337).  The VE clarified that if the pace of production or production quota were set by an external source, the job would be eliminated (Docket No. 12, p. 76 of 337).  Furthermore, the VE explained that as Plaintiff had performed the hand packager position, the job would not be eliminated (Docket No. 12, p. 76 of 337).

**B.**     **MEDICAL RECORDS**

Summaries of Plaintiff's medical records, to the extent they are necessary and relevant to the issues before this Court, follow.

6

1.      ST. VINCENT MERCY MEDICAL CENTER

●       On July 7, 2008, Plaintiff had x-rays of her knees after complaining of chronic knee pain.  The
        results of the radiology report reflect that Plaintiff's x-rays were normal (Docket No. 12, p. 265
        of 337).

●       On March 20, 2009, Plaintiff had radiological images taken of her knees after complaining of
        knee pain.  The radiology report notes that both knees were normal (Docket No. 12, p. 259 of
        337).

●       On March 26, 2010, Plaintiff had x-rays of both knees.  The radiology report revealed minimal
        degenerative change of the medial tibiofemoral compartment, which was minimally progressive
        in both knees (Docket No. 12, pp. 253-254 of 337).

2.      UNISON BEHAVIORAL HEALTH GROUP

        a.      ADULT DIAGNOSTIC ASSESSMENT & UPDATE

An unsigned Adult Diagnostic Assessment reflects that Plaintiff began treatment with the Unison

Behavioral Health Group on January 29, 2008.  Among the symptoms listed for Plaintiff are chronic pain,

depression, unresolved grief, marked anxiety, impulsiveness, mood swings, hyperactivity, mania, unresolved

interpersonal relationship issues, and poor self-esteem.  It is noted that Plaintiff's mental health contributes to

impaired abilities in personal hygiene, household tasks, cooking, nutrition, personal safety, leisure and

recreational activities, social and family relations, coping skills, emotional management, childcare, parenting,

and financial, medical, and medication management.  According to the assessment, Plaintiff is homeless, has

four children from three different relationships, all of whom live scattered among family members.  It is noted

that Plaintiff was raised by her maternal grandparents after her parents were killed in a car accident when

Plaintiff was two years old and that she reported being abused as a child.  Her family history includes mental

health and substance-related disorders.  Plaintiff is described as a high school graduate and having been last

employed in June 2007.  A past history of psychological treatment and hospitalizations, is noted including a

7

diagnosis for Bipolar Disorder.  Plaintiff's medications are listed as Seroquel,[3] Effexor,[4] Nexium,[5] and Tylenol.
A history of nicotine, alcohol, cannabis, and cocaine abuse is also noted.  Plaintiff's primary diagnoses reflect
Major Depressive Disorder, recurrent, severe without psychotic features, Generalized Anxiety Disorder, and
Impulse-Control Disorder not otherwise specified.  Plaintiff was assessed a Global Assessment of Functioning
(GAF)[6] score of 59 (Docket No. 12, pp. 268-281 of 337).

On June 16, 2009, an adult diagnostic assessment update was rendered for Plaintiff, which noted that
she had graduated "Gensis," would benefit from therapy, struggles to cope with family issues, and refuses to
talk to family fearing that she would become too upset.  The assessment reflects no change in Plaintiff's
diagnosis or GAF score from the prior assessment (Docket No. 12, pp. 266-267 of 377).

### b. INITIAL PSYCHIATRIC EVALUATION - DR. USHA SALVI, M.D.

On March 17, 2008, Plaintiff underwent a psychiatric evaluation with Dr. Salvi for approximately 60
minutes.  Dr. Salvi's report details Plaintiff's history of present illness and background.  Dr. Salvi described
Plaintiff as a 39-year-old female who was a little obese, but otherwise appropriate in appearance.  Plaintiff was
observed as initially sobbing, crying, angry and frustrated, but becoming euthymic and having calmer affect.
The evaluation report notes that Plaintiff maintained good eye contact, her speech was spontaneous and

---

[3] Seroquel is prescribed to treat mental and mood conditions. *See Seroquel oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:42 PM), http://www.webmd.com/drugs/2/drug- 4718/seroquel-oral/details.

[4] Effexor is prescribed to treat depression. *Effexor oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:43 PM), http://www.webmd.com/drugs/2/drug-1836/effexor-oral/details.

[5] Nexium is prescribed to treat increased stomach acid. *See Conditions that Nexium Packet oral Treats*, WEBMD, (Dec. 9, 2014, 1:45 PM), http://www.webmd.com/drugs/2/drug-147599/nexium-packet-oral/details/list-conditions.

[6] A GAF score is a subjective determination made by a clinician concerning a patient's psychological, social and occupational functioning based on mental functioning. *See Global Assessment of Functioning (GAF) Scale*, MICH. ST. UNIV. (Nov. 6, 2014, 10:26 AM), https://www.msu.edu/course/sw/840/stocks/pack/axisv.pdf (citing DSM-IV-TR, p. 34).

adequate, and she reported being in an average mood, having no current suicidal thoughts, but having

experienced passive thoughts about death.  Plaintiff denied hallucinations and paranoia and her thought process

was described as organized and goal-directed.  Cognitively, Dr. Salvi found Plaintiff alert and oriented to place,

person and time, with adequate general knowledge, average intelligence, intact recent and remote memory, with

fair concentration, insight and judgment.  Dr. Salvi diagnosed Plaintiff with Dysthymic Disorder, Major

Depressive Disorder, recurrent, severe, without psychotic features, Anxiety Disorder not otherwise specified,

Marijuana Abuse, in early full remission, and included a note to rule out Personality Disorder not otherwise

specified.  Plaintiff was assessed a GAF score of 55.  Dr. Salvi increased Plaintiff's Effexor medication,

reduced her dosage of Seroquel, and added Trazodone[7] to help her sleep at night.  Plaintiff was advised to

continue her counseling and maintain sobriety (Docket No. 12, pp. 282-286 of 337).

### c.  TREATMENT - DR. SATWANT GILL, M.D.

- On December 3, 2010, Plaintiff was seen for a routine follow-up and reported doing well on her medications and feeling good about being able to see her children.  Plaintiff's medications were listed as Depakote ER,[8] Wellbutrin XL,[9] Risperdal,[10] and Seroquel.  Plaintiff denied experiencing any hallucinations, paranoia, suicidal or homicidal ideations, and indicated that she had not consumed any alcohol or illicit substances.  Plaintiff was described as being neat, alert, oriented, cooperative, having stable mood and affect, without formal thought disorder, and not appearing in any acute distress or to be a threat to herself or others.  Dr. Gill continued Plaintiff on her

---

[7] Trazodone is prescribed to treat anxiety and insomnia related to depression. *Trazodone oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:48 PM), http://www.webmd.com/drugs/2/drug-11188-89/trazodone-oral/trazodone-oral/details.

[8] Depakote ER is prescribed to treat seizure disorders, mental and mood conditions. *Depakote ER oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:50 PM), http://www.webmd.com/drugs/2/drug-19881/depakote-er-oral/details.

[9] Wellbutrin XL is prescribed to treat depression. *Wellbutrin XL oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:51 PM), http://www.webmd.com/drugs/2/drug-76851/wellbutrin-xl-oral/details.

[10] Risperdal is prescribed to treat mental and mood disorders. *Risperdal oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:53 PM), http://www.webmd.com/drugs/2/drug-9846/risperdal-oral/details.

medications (Docket No. 12, pp. 287-288 of 337).

- On January 5, 2011, Plaintiff reported no side effects from her medications and that she had been doing well. Plaintiff indicated that she felt fortunate to have been able to spend the holidays with her children, and that she had been sleeping well. Plaintiff denied experiencing mood swings, depression, paranoia, suicidal or homicidal ideations, and reported that she had not used any alcohol or illicit substances. Dr. Gill described Plaintiff as appearing casually, alert, oriented, cooperative, maintaining good eye contact, and having stable mood and affect. Dr. Gill observed that Plaintiff showed no signs of formal thought disorder, internal stimulation, overt delusional thinking, acute distress, or looseness of association. Plaintiff was continued on her medications (Docket No. 12, pp. 289-290 of 337).

- On March 9, 2011, Plaintiff did not show for her appointment (Docket No. 12, p. 291 of 337).

- On April 29, 2011, Plaintiff reported that she was doing well with her medications. Plaintiff indicated being able to visit her older children, sleeping well, and denied any changes in her symptoms. Plaintiff was described as appearing casually dressed, alert, oriented, cooperative, maintaining good eye contract with stable mood and affect. A review of her mental symptoms did not reveal any abnormalities. Dr. Gill maintained Plaintiff's medications (Docket No. 12, pp. 292-293 of 337).

- On July 8, 2011, Plaintiff denied any side effects from her medications and indicated that she was doing well and was happy to be able to see her children again. Plaintiff denied experiencing any new symptoms. Dr. Gill described Plaintiff as appearing neatly dressed, alert, oriented, cooperative, maintaining good eye contact, with stable mood and affect. Dr. Gill's noted no abnormalities during his examination of Plaintiff and continued her on her medications, but recommended she undergo blood testing for liver functioning (Docket No. 12, pp. 312-313 of 337).

- On September 30, 2011, Plaintiff reported that she was doing well and denied experiencing any new symptoms. Plaintiff was described as alert, oriented, cooperative, maintaining good eye contact, with stable mood and effect. Dr. Gill noted no other abnormalities and continued Plaintiff on her medications (Docket No. 12, p. 314 of 337).

- On December 28, 2011, Plaintiff reported that she had been taking two Seroquel pills which she felt was beneficial and denied experiencing any new symptoms. Dr. Gill described Plaintiff as casually dressed, alert, oriented, cooperative, maintaining good eye contact, with stable mood and affect. Dr. Gill noted no abnormalities during his examination, continued Plaintiff on her medications, advised her to get her liver functioning tested, and of the side effects of her medications (Docket No. 12, pp. 322-323 of 337).

- On February 13, 2012, Plaintiff denied suffering any side effects from her medications and indicated that she was doing well and had not experienced any new symptoms, but had been unable to get the liver functioning tests completed because she did not have insurance. Dr. Gill

10

described Plaintiff as dressed neatly, alert, oriented, cooperative, maintaining good eye contact, with stable mood and affect.  Dr. Gill noted no abnormalities during his examination of Plaintiff and continued her on her medications at her request (Docket No. 12, pp. 324-325 of 337).

- On May 7, 2012, Plaintiff reported being incarcerated for a period of time in the month of March, but denied any new symptoms or side effects from her medications.  Dr. Gill described Plaintiff as casually dressed, alert, oriented, maintaining good eye contact, with stable mood and affect.  Dr. Gill noted no abnormalities during his examination.  The treatment notes reflect that Plaintiff had still not undergone the recommended liver functioning tests, but was making plans to do so.  Plaintiff's medications were continued (Docket No. 12, pp. 326-327 of 337).

- On July 25, 2012, Plaintiff reported no new symptoms or side effects.  Dr. Gill described Plaintiff as alert, oriented, cooperative, casually dressed, and with an okay mood and congruent affect.  Plaintiff's memory was intact, her thought form linear, with fair insight and judgment.  Dr. Gill's diagnosed Bipolar Disorder not otherwise specified.  Plaintiff was continued on her medications and provided supportive psychotherapy (Docket No. 12, p. 328 of 337).

- On October 17, 2012, Plaintiff reported feeling better, denied any side effects from her medications, but did note that she gets stressed out and cannot work because she "freaks out" at work, gets irritated, anxious and nervous.  Plaintiff denied any hallucinations, paranoid, suicidal or homicidal ideations, and also denied using alcohol or illicit substance use.  Dr. Gill described Plaintiff as being casually dressed, alert, oriented, cooperative, mildly nervous and anxious, having stable mood and affect.  No abnormalities were otherwise noted and Dr. Gill continued Plaintiff on her medications (Docket No.12, pp. 333-334 of 337).

- On December 17, 2012, Plaintiff reported being stable, denied experiencing any new symptoms, reported being compliant with her medications, and had not suffered from any side effects.  Dr. Gill described Plaintiff as alert, oriented, cooperative, appearing casually dressed, with normal speech rate, tone and volume, okay mood, congruent affect, having intact memory, linear thought form, and fair insight and judgment.  Plaintiff's diagnosis and GAF score remained unchanged and she was continued on her medications (Docket No. 12, p. 332 of 227).

- On February 11, 2013, Plaintiff reported that her medications were working well for her, that she was stable, had been compliant with her medications, and denied experiencing any new symptoms.  Dr. Gill again described Plaintiff as reported on December 17, 2012 (Docket No. 12, p. 331 of 337).

### d. MEDICAL SOURCE LETTER

A letter from Dr. Gill, which is dated December 6, 2012, reflects that Plaintiff has been a client at Unison BHG, Inc. since August 2008.  Dr. Gill lists Plaintiff's diagnostic impression as Bipolar Disorder not otherwise specified and notes her psychotropic medications as Risperdal, Seroquel, Wellbutrin XL, and

Depakote ER.  Dr. Gill opined that Plaintiff is unable to work or engage in any meaningful activities due to her symptoms from her psychiatric illness, noting in parenthesis, irritability, anxiety, and nervousness (Docket No. 12, p. 330 of 337).

**3.  UHA NEIGHBORHOOD HEALTH ASSOCIATION**

- On September 19, 2008, Plaintiff presented complaining of right foot pain, and underwent an x-ray of both feet at Flower Hospital.  A handwritten note suggests Plaintiff had a heel spur, but the record is otherwise illegible (Docket No. 12, p. 301 of 337).

- On December 18, 2008, Plaintiff was evaluated for arthritis and reported that her "knees were going out all of the time" and that she had pain in her wrist, ankles and the instep of her right foot.  Plaintiff's medical provider recommended that she lose weight and prescribed Motrin and another unknown medication.  The handwritten treatment notes are otherwise illegible (Docket No. 12, p. 300 of 337).

- On January 16, 2009, Plaintiff did not show up for her appointment with Dr. Jean (Docket No. 12, p. 299 of 337).

- On January 28, 2009, Plaintiff cancelled and rescheduled her appointment with Dr. Rowan (Docket No. 12, p. 299 of 337).

- On March 11, 2009, Plaintiff presented for a follow-up and it was noted that an x-ray of her knees had not been completed.  Plaintiff complained that the back of her knees ached, but were not swollen (Docket No. 12, p. 299 of 337).

- On March 20, 2009, Plaintiff complained of spasms in her right foot and that after feeling better for three weeks that her right foot had started hurting again.  The treatment notes reflect that Plaintiff had a right heel spur, was given an injection, and was advised to get an arch support (Docket No. 12, p. 299 of 337).

- On June 18, 2009, Plaintiff reported being in pain, having spasms, and experiencing knee pain.  On examination, Plaintiff was described as in no acute distress (Docket No. 12, p. 298 of 337).

- On July 17, 2009, Plaintiff cancelled and rescheduled her appointment with Dr. Jean (Docket No. 12, p. 298 of 337).

- On September 23, 2009, Plaintiff reported being about the same and made some indication about pain (Docket No. 12, p. 298 of 337).

- On October 16, 2009, Plaintiff cancelled and rescheduled her appointment with Dr. Jean (Docket No. 12, p. 298 of 337).

12

- On February 17, 2010, Plaintiff again cancelled and rescheduled her appointment (Docket No. 12, p. 298 of 337).

- On September 2, 2010, Plaintiff had a three-month follow-up.  The handwritten notes reflect that Plaintiff complained of back pain.  The other notations from the appointment are illegible (Docket No. 12, p. 296 of 337).

- On March 1, 2010, Plaintiff reported feeling better, but the notes from the examination are otherwise illegible (Docket No. 12, p. 297 of 337).

- On June 2, 2010, Plaintiff again presented for a follow-up and indicated no changes, but that she had lost weight.  A notation indicates that Plaintiff was stable (Docket No. 12, p. 297 of 337).

- On January 3, 2011, Plaintiff did not show for her appointment with Dr. Rowan (Docket No. 12, p. 296 of 337).

- On February 24, 2011, Plaintiff presented for a follow-up and for medication refills.  Plaintiff reported being about the same.  Plaintiff's treatment notes reflect that she was prescribed at least three medications (Docket No. 12, p. 295 of 337).

- On May 25, 2011, a notation indicates that Plaintiff called and rescheduled her appointment with Dr. Rowan (Docket No. 12, p. 295 of 337).

- On July 7, 2011, Plaintiff presented for medication refills and reported that Daypro[11] had been ineffective.  Plaintiff complained of left hand pain at her left thumb area for months and chronic knee pain.  On examination, Plaintiff was alert and oriented.  Plaintiff was counseled about weight loss, diagnosed with gastroesophageal reflux disease (GERD), and prescribed two medications (Docket No. 12, p. 302 of 337).

### 4.    CORDELIA MARTIN HEALTH CENTER

- On November 8, 2011, Plaintiff presented to medical provider Alexis Williams complaining of depression and backache.  The treatment notes indicate an unspecified diagnosis and list her

---

[11] Daypro is prescribed to treat arthritis. *Daypro oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:55 PM), http://www.webmd.com/drugs/2/drug-6746/daypro-oral/details.

current medications as Tylenol, Depakote ER, Seroquel, Wellbutrin, Naproxen,[12] and Ultram[13] (Docket No. 12, p. 316 of 337).

- On January 19, 2012, Plaintiff sought medication refills from Dr. Eric Frywell, M.D. and reported doing well, but complained of a cough and sore throat.  On physical examination, Dr. Frywell noted no abnormalities.  Plaintiff's assessment reflects she has GERD and lumbago.  Dr. Frywell prescribed her Omeprazole[14] and Meloxicam[15] (Docket No. 12, p. 317 of 337).

- On February 23, 2012, Plaintiff saw Nurse Practioner Tamara Bumpus and complained of suffering from a cough for about a week or longer, having a fever, and that she was beginning to "feel bad."  Plaintiff indicated that she smokes cigarettes.  During her review of symptoms, Ms. Bumpus noted that Plaintiff reported swollen glands, coughing and wheezing, joint pain, swelling and muscle atrophy.  On physical examination, Ms. Bumpus described Plaintiff as alert, cooperative, oriented, hoarse and nasally.  Plaintiff's mental status was noted being appropriate.  Plaintiff's diagnosis was bronchitis and tobacco abuse.  Plaintiff was prescribed penicillin, ibuprofen, and Proventil HFA[16] (Docket No. 12, pp. 318-319 of 337).

- On June 28, 2012, Plaintiff presented herself for an examination with Ms. Bumpus.  On physical examination, Ms. Bumpus did not note any abnormalities.  Plaintiff diagnoses are listed as Lumbago, GERD, Depression, Tobacco Abuse and obesity.  Plaintiff was prescribed Meloxicam, Omeprazole, and advised about her weight and tobacco use (Docket No. 12, pp. 320-321 of 337).

## C.   CONSULTATIVE EXAMINATION

### 1.   DR. REKHA R. TRIVEDI, M.D. - CONSULTATIVE PHYSICAL EXAMINATION

---

[12] Naproxen is prescribed to relieve pain.  *See naproxen oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:56 PM), http://www.webmd.com/drugs/2/drug-5173-1289/naproxen-oral/naproxen-oral/details.

[13] Ultram is prescribed to relieve moderate to moderately severe pain. *Ultram oral: Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:58 PM), http://www.webmd.com/drugs/2/drug-11276/ultram-oral/details.

[14] Omeprazole is prescribed to treat stomach and esophagus problems.  *See omeprazole oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 1:59 PM), http://www.webmd.com/drugs/2/drug-3766-143/omeprazole-oral/omeprazoledelayed-releasecapsule-oral/details.

[15] Meloxicam is prescribed to treat arthritis.  *See meloxicam oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 2:00 PM), http://www.webmd.com/drugs/2/drug-911/meloxicam-oral/details.

[16] Proventil HFA is prescribed to prevent wheezing and shortness of breath caused by breathing problems. *Proventil HFA inhalation: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Dec. 9, 2014, 2:00 PM), http://www.webmd.com/drugs/2/drug-8197/proventil-hfa-inhalation/details.

On July 19, 2011, Plaintiff underwent a consultative physical examination and reported a four-year history of lower back pain after being involved in an automobile accident.  Plaintiff complained of constant aching pain in her lower back, which is sometimes sharp and is intensified by lifting, bending, long walking, standing, and sitting activities.  Plaintiff's medications were listed as Depakote ER, Wellbutrin, Meloxican, Omeprazole, and Risperdal.  Plaintiff's employment history notes that she last worked in 2005 and reflects a history of factory and restaurant work on and off for ten years.  Dr. Trivedi's report reflects that Plaintiff is a high school graduate, smokes a half pack of cigarettes a day, and denied consuming alcohol.

During her review of symptoms, Plaintiff complained of gaining 100 pounds in the last year and of back and knee pain, back swelling, forgetfulness and occasional headaches.  On physical examination, Dr. Trivedi described Plaintiff as obese, but not in acute distress.  It was noted that Plaintiff had tenderness present over her left lumbar paraspinals.  An x-ray of Plaintiff's lumbar spine revealed  mild degenerative disease throughout with loss of disk height.  Among Dr. Trivedi's medical impressions for Plaintiff were chronic low back pain, Depression, and Degenerative Disease.  Dr. Trivedi's summary reflects that the examination revealed no sensory or reflex impairments, but that Plaintiff has decreased dorsolumbar spine motion with pain, showed poor effort on dynamometer testing on her left side with complaints of pain, but that Plaintiff is otherwise able to speak, hear, handle objects, sit, stand, and walk with frequent rest periods (Docket No. 12, pp. 303-311 of 337).

## III.  STANDARD OF DISABILITY

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014).  At step one, a claimant must demonstrate she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Colvin v. Barnhart*, 475 F.3d 727, 730

15

(6th Cir. 2007)(citing *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  At step two, the claimant must show that she suffers from a "severe impairment." *Colvin*, 475 F.3d at 730.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (citing *Abbott*, 905 F.2d at 923).  At step three, the claimant must demonstrate that her impairment or combination of impairments meets or medically equals the listing criteria set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. § 416.920(d) (West 2014).  If the claimant meets her burden she is declared disabled, however, if she does not, the Commissioner must determine her residual functional capacity. 20 C.F.R. § 416.920(e) (West 2014).

A claimant's residual functional capacity is "the most [the claimant] can still do despite [the claimant's] limitations."  20 C.F.R. § 416.945(a) (West 2014)*.*  In making this determination, the regulations require the Commissioner to consider all of the claimant's impairments, including those that are not "severe." 20 C.F.R. § 416.945(a)(2) (West 2014).  At the fourth step in the sequential analysis, the Commissioner must determine whether the claimant has the residual functional capacity to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014).  Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 416.960(b),  416.965(a) (West 2014). If the claimant has the RFC to perform her past work, the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If, however; the claimant lacks the RFC to perform her past work, the analysis proceeds to the fifth and final step. *Id.*

The final step of the sequential analysis requires the Commissioner to consider the claimant's residual functional capacity, age, education, and work experience to determine whether the claimant can make an adjustment to other work available. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  While the claimant has

16

the burden of proof in steps one through four, the Commissioner has the burden of proof at step five to show "that there is work available in the economy that the claimant can perform." *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  The Commissioner's finding must be "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)(citation omitted).  If a claimant can make such an adjustment,  the claimant will be found not disabled. 20 C.F.R. §§ 416.920(a)(4)(v),  (g) (West 2014).  If an adjustment cannot be made then the claimant is disabled. *Id.*

## IV.  COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Warner made the following findings:

1.  Plaintiff has not engaged in substantial gainful activity since May 24, 2011, the application date.

2.  Plaintiff has the following severe impairments: a depressive disorder; minimal degenerative joint disease of the bilateral knees; mild lumbar spine degenerative disease; and obesity.

3.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.  After careful consideration of the entire record, ALJ Warner found that Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 416.967(b) except: occasionally climb ladders and the like; occasionally kneel; frequently crouch; never crawl; work with an SVP of 1 to 2 where the pace of productivity is not dictated by an external source over which Plaintiff has no control such as an assembly line or conveyor belt; occasional contact with the general public; and occasional contact with supervisory authority.

5.  Plaintiff is capable of performing past relevant work as a hand packager.  This work does not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

6.  Plaintiff has not been under a disability as defined in the Social Security Act, since May 24, 2011, the date the application was filed.

(Docket No. 12, pp. 25-35 of 337).

## V.  STANDARD OF REVIEW

17

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006). On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)). The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)). "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance." *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)). "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

### A.    PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence and asserts two assignments of error, arguing, (1) ALJ Warner erred in relying upon a prior ALJ's findings in her decision pursuant to *Drummond*; and (2) that ALJ Warner failed to consider whether the opinion of Plaintiff's treating

psychiatrist was deserving of significant weight even if it was not entitled to controlling weight (Docket Nos.

14 & 18).

**B.**     **DEFENDANT'S ALLEGATIONS**

Defendant concedes that *Drummond* is inapplicable to this case, but contends that the Court need not

reach the issue because the ALJ concluded that new and material evidence warranted a change from the prior

ALJ's decision and included "significant additional limitations" (Docket No. 17, pp. 7-8 of 11).  Defendant

asserts that the question before the Court is whether the ALJ's decision is supported by substantial evidence

(Docket No. 17, p. 8 of 11).  Defendant argues that the ALJ reasonably weighed the medical evidence with

respect to Plaintiff's treating psychiatrist and that the decision is supported by substantial evidence (Docket No.

17, pp. 8-9 of 11).

**C.**     **ANALYSIS**

**1.**     **THE *DENNARD* & *DRUMMOND* DECISIONS**

In *Dennard v. Sec. of Health & Human Servs.*, 907 F.2d 598, 598 (6th Cir. 1990)(per curiam), the Sixth

Circuit held that in cases where the Secretary determines on an initial application for benefits that the claimant

is not capable of performing his past relevant work, subsequent ALJs are precluded, by estoppel, from

reconsidering the issue and finding that the claimant is capable of performing such past relevant work. *Id.* at

599-600.  Seven years after *Dennard*, the Sixth Circuit decided *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d

837, 838 (6th Cir. 1997), and addressed whether the principles of res judicata could be applied against the

Commissioner of Social Security on claims which have been previously determined, holding that "[w]hen the

Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is

bound by this determination absent changed circumstances." *Id.* at 842.  Following the *Dennard* and *Drummond*

decisions, the Social Security Administration (SSA) issued AR 98-3(6) and 98-4(6), which explained  how the

SSA would apply the *Dennard* and *Drummond* decisions within the Sixth Circuit, providing, in relevant part:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the *final decision* by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

AR 98-3(6), 1998 WL 283901 at *3 (June 1, 1998); AR 98-4(6), 1998 WL 283902 at *3 (June 1, 1998)(emphasis added).

"Although Social Security Rulings do not have the same force and effect as statutes or regulations, 'they are binding on all components of the Social Security Administration' and 'represent precedent final opinions and orders and statements of policy' upon which we rely in adjudicating cases." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 n.1 (6th Cir. 2009)(*quoting* 20 C.F.R. § 402.35(b)).  Courts within the Sixth Circuit have repeatedly upheld cases in which ALJ's have applied *Drummond* and AR 98-4(6) determining they were bound by the findings of a previous ALJ.  *See Thomas v. Comm'r of Soc. Sec.* 2014 WL 3845797 at *9 (N.D. Ohio 2014)(slip opinion); *Cook v. Comm'r of Soc. Sec. Admin.*, 2014 WL 2921016 at *11-13 (N.D. Ohio 2014)(slip opinion); *Parks v. Comm'r of Soc. Sec. Admin.*, 2014 WL 1493394 at *20 (N.D. Ohio 2014)(slip opinion). Courts in this district have also recognized, however, that "it is axiomatic that a decision vacated by the Appeals Council has no *res judicata* affect, making *Drummond* inapplicable to such cases." *Zayid v. Comm'r of Soc. Sec. Admin.*, 2014 WL 517466, at *6 (N.D. Ohio 2014)(slip opinion)(emphasis in the original)(*quoting Williams v. Astrue*, 2012 WL 892544 at *6 (N.D. Ohio 2012)(unpublished)(internal quotation marks omitted)).

The facts of this case present a unique scenario.  While this case was before ALJ Warner for a decision on Plaintiff's application for SSI filed on May 24, 2011, two prior applications for SSI and Disability Income Benefits (DIB) filed on April 28, 2008, were pending review before the U.S. District Court in Case No.

3:12CV2185.  *See Brogan v. Comm'r of Soc. Sec.*, No. 3:12CV2185 (N.D. Ohio filed Aug. 27, 2012).  Plaintiff asserts that because the applications were pending, they were neither binding nor final decisions on which the ALJ could rely under 20 C.F.R. § 416.1481 (Docket No. 14, pp. 8-9 of 14).  Consequently, on September 19, 2013, the federal court in Case No. 3:12CV2185, remanded Plaintiff's prior disability case because it was not supported by substantial evidence (Docket No. 14, p. 9 of 14). *See Brogan v. Comm'r of Soc. Sec*., 2013 WL 5308717 (N.D. Ohio 2013)(slip opinion).  On remand, the Appeals Council subsequently vacated the prior ALJ's decision in that case (Docket No. 14, Attachment 1, pp. 4-5 of 5).  Plaintiff contends that ALJ Warner erred in this case by applying *Dennard*, *Drummond*, AR 98-3(6), and AR 98-4(6) to her decision and  relying on the prior ALJ's findings in Case No. 3:12CV2185 (Docket No. 14, pp. 8-9 of 14).  To the extent ALJ Warner relied on the prior ALJ's decision to reach her conclusions in this case, Plaintiff maintains that ALJ Warner's decision is in error and remand is appropriate (Docket No. 14, p. 9 of 14).  Defendant concedes that *Drummond* is not applicable to this case, but argues that it is unnecessary for the Court to address the issue since the ALJ concluded new and material evidence warranted a change in the RFC rendered by the prior ALJ (Docket No. 17, pp. 7-8 of 11).

The undersigned Magistrate agrees with the parties that *Drummond* is inapplicable to this case. Pursuant to SSA AR 98-4(6), adjudicators must adopt findings from the "final decision" by an ALJ or the Appeals Council, absent new or material evidence, or a change in the law. AR 98-4(6), 1998 WL 283902 at *3. Although AR 98-4(6) does not specify whether a final decision by the ALJ or Appeals Council must also be a binding decision, the Sixth Circuit's decision in *Drummond* suggests that *res judicata* only applies to final decisions not subject to any additional review. *See Drummond*, 126 F.3d at 842-843 (citing *Gavin v. Heckler*, 811 F.2d 1195, 1200 (8th Cir. 1987)("it appears that the ALJ has reevaluated the evidence presented at the 1979 hearing.  The doctrine of collateral estoppel, applicable here, forbids this.); *Wilson*, 580 F.2d at 211 ("once a

21

decision on a disability claim becomes final, 'if it is not appealed to the district court pursuant to 42 U.S.C. § 405(g), it may not be reviewed by the district court as part of another subsequent decision by the Secretary.'"). This interpretation is consistent with the regulations.  The language of 20 C.F.R. § 416.1400 provides that the Agency will have made their "final decision" when the claimant has completed the steps of the administrative review process, but such a decision is not by regulations binding until the claimant has sought judicial review by filing an action in federal district court or the time permitted for seeking such review has expired. *See* 20 C.F.R. §§ 416.1400, 416.1455(b), 416.1481 (West 2014).  Consistent with this district's unpublished decisions in *Zayid* and *Williams*, the undersigned Magistrate is persuaded that *Drummond* and *res judicata* are inapplicable where a decision is vacated by the Appeals Council.  *Zayid*, 2014 WL 517466, at *6 (citation omitted); *Williams,* 2012 WL 892544 at *6.

Notwithstanding the ALJ's misapplication of *Drummond*, Defendant contends that since ALJ Warner concluded that new and material evidence warranted a change in Plaintiff's RFC, that the Court need not address the effect of ALJ Warner's reliance on the prior ALJ's decision (Docket No. 17, p. 8 of 11).  The problem with Defendant's contention is that the language of ALJ Warner's decision makes it unclear to what extent ALJ Warner considered the prior ALJ's decision in formulating Plaintiff's RFC and capabilities for performing her past work.  Since ALJ Warner erroneously applied *Drummond* and associated Agency acquiescence rulings to this case, it follows that the ALJ did not comply with the agency's rules and regulations. The Sixth Circuit recognizes "[a]n ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)(*quoting Blakley v. Comm'r of Soc. Sec*., 581 F.3d 399, 407 (6th Cir. 2009)).

Accordingly, the undersigned Magistrate recommends that this Court find the ALJ's RFC assessment

and findings concerning Plaintiff's capability for past relevant work are not supported by substantial evidence.

## 2.  WHETHER THE ALJ PROPERLY CONSIDERED DR. GILL'S OPINION

Next, Plaintiff argues that the ALJ erred in her decision by failing to consider the requisite factors set forth in 20 C.F.R. § 416.927(c) and provide "good reasons" for her decision to afford Dr. Gill's opinions no weight in her analysis (Docket No. 14, pp. 9-12 of 14).  Defendant disagrees and contends that the ALJ's credibility assessment for Dr. Gill was appropriate because Dr. Gill offered a blanket statement on a matter reserved for the Commissioner (Docket No. 17, pp. 8-9 of 11).  Defendant also notes that the ALJ indicated that Dr. Gill's opinions were disproportionate to his own treatment notes and that Plaintiff failed to identify any evidence in the record to contradict the ALJ's observations (Docket No. 17, p. 9 of 11).

### a.  THE TREATING PHYSICIAN RULE

Federal regulations prescribe certain standards an ALJ must follow in assessing the medical evidence contained in the record.  The treating physician rule is one such standard and requires that a treating source's opinion be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise "inconsistent with the other substantial evidence in the case record." *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (*quoting Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004)); *Blakley*, 581 F.3d at 406; *see also* SSR 96-2P, 1996 WL 374188, *1 (July 2, 1996). The regulations define a treating source as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had an ongoing treatment relationship with you." 20 C.F.R. § 416.902 (West 2014).   The physician, psychologist, or other acceptable medical source must treat the claimant "'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)(*quoting Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir.

2007)).  The treating physician rule stems from the belief that a claimant's treating physicians are best positioned, as medical professionals, to provide a detailed picture of the claimant's impairment and can provide a unique perspective that might not otherwise be obtained from the objective evidence or other reports of examinations. *See* 20 C.F.R. § 404.1527(c)(2) (West 2014).

Where a treating physician's opinion is not given controlling weight,  a rebuttable presumption remains that such opinion is entitled to great deference. *Rogers*, 486 F.3d at 242 (citation omitted).  To reject a treating physician's opinions an ALJ must provide "good reason" for doing so in the decision to make it sufficiently clear to "subsequent reviewers the weight the adjudicator gave the treating source's medical opinion and the reasons for that weight." *Id.* (citing SSR 96-2P, 1996 WL 374188, *5). "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where the claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he or she is not, unless some reason for the agency's decision is supplied." *Wilson*, 378 F.3d at 544 (citation omitted).   To comply with the obligation to provide good reasons for discounting a treating source's opinion, the ALJ must (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record; (2) identify evidence supporting such finding; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Allums v. Commissioner*, 2013 WL 5437046, *3 (N.D.Ohio 2013) (citing *Wilson,* 378 F. 3d at 546). Those factors require the ALJ to consider the length, frequency, nature and extent of the treatment relationship, the evidence the medical source presents to support their opinion (supportability), the consistency of the opinion with the record as a whole, the specialization of the physician, and any other factors which tend to support or contradict the opinion.  20 C.F.R. § 416.927(c)(2) (West 2014).

24

For medical opinions rendered by sources that cannot be classified as "treating sources," the regulations provide a framework for evaluating such opinions.  *See* 20 C.F.R. § 416.927(c) (West 2014). "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source") . . . and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013)(citation omitted).  In evaluating these opinions, the regulations require the ALJ to consider the § 416.927(c)(2) factors for all medical opinions that are not entitled to controlling weight.

The record in this case reflects that from December 3, 2010 thru February 11, 2013, Plaintiff treated with Dr. Gill on 12 occasions.

#### b.  THE ALJ'S DECISION CONCERNING DR. GILL IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Although ALJ Warner refers to and summarizes some of Plaintiff's treatment with Dr. Gill, the decision does not indicate whether Dr. Gill's opinions were considered and analyzed as those of a treating source.  In addressing Dr. Gill's opinions, expressed in his letter of December 2012, ALJ Warner determined that Dr. Gill's opinions were entitled to no weight, reasoning that the letter is a "blanket statement," an opinion on an issue reserved for the Commissioner, "is not function by function, is not probative of functioning, and is well disproportionate to Dr. Gill's own treatment notes" (Docket No. 12, p. 32 of 337).  ALJ Warner also included a three-sentence commentary on the motives of doctors rendering opinions for patients (Docket No. 12, p. 32 of 337).  Missing from ALJ Warner's decision, however, is an analysis of the requisite § 416.927(c) factors and "good reasons" for assessing Dr. Gill's opinions no weight in her decision.  *See* 20 C.F.R. § 416.927(c); SSR

96-2p, 1996 WL 374188 at *4 (July 2, 1996)("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference *and must* be weighed using *all* of the factors provided in 20 C.F.R. 404.1527 and 416.927." (West 2014)(emphasis added). For example, ALJ Warner does not identify the treatment notes of Dr. Gill that are disproportionate to his opinions and does not identify the evidence of the record that "departs substantially" from Dr. Gill's opinions. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013)(finding the ALJ's failure to provide "good reasons" hindered meaningful review of the ALJ's application of the treating-physician rule and that the ALJ had failed to identify the substantial evidence that was purportedly inconsistent with the treating source's opinions.).

While Dr. Gill may have rendered opinions on issues reserved for the Commissioner, specifically, Plaintiff's ability to work, Dr. Gill's letter also contained medical opinions, including his diagnosis for Plaintiff, her medications, and the symptoms of her psychiatric illness (Docket No. 12, p. 330 of 337). *See* 20 C.F.R. § 416.927(a)(2) (West 2014)("Medical opinions are statements from your physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."); *see also* SSR 96-5p, 1996 WL 374183, *5 (July 2, 1996)("Medical sources often offer opinions about whether an individual . . . is "disabled" or "unable to work," or make similar statements of opinions. . . . Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner. Such opinions on these issues must not be disregarded.").

26

Courts in the Sixth Circuit have repeatedly recognized that an "ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Cole v. Astrue*, 661 F.3d 931, 939-40 (6th Cir. 2011)(*quoting Blakley*, 581 F.3d at 407).  The Sixth Circuit has also held that "we do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions for ALJs that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." *Hensley*, 573 F.3d at 267 (*quoting Wilson*, 378 F.3d at 545 (citation omitted)).  Given the ALJ's incomplete analysis and the lack of a rationale to support  the weight she gave Dr. Gill's opinion, the undersigned Magistrate recommends that this Court find the ALJ's findings concerning Dr. Gill are not supported by substantial evidence.

## VII. CONCLUSION

For the foregoing reasons, the undersigned Magistrate recommends that the Court reverse the Commissioner's decision and remand this case  to the Commissioner, pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.  On remand, the Commissioner should: (1) reassess Plaintiff's residual functional capacity and her ability to perform past relevant work without considering the previously vacated administrative decision from September 3, 2010; (2) engage in an adequately supported analysis of Dr. Gill's opinion in accordance with 20 C.F.R. § 416.927(c) and; (3) determine disability based on the new assessments.


/s/Vernelis K. Armstrong
United States Magistrate Judge

Date: December 31, 2014

**VIII. NOTICE**

Please take notice that as of this date the Magistrate Judge's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR THE NORTHERN DISTRICT OF OHIO, any party may object to this report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.